NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SAMANTHA M., NYKKOLAS S., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, K.S., *Appellees*.

No. 1 CA-JV 15-0049
FILED 11-10-2015

Appeal from the Superior Court in Maricopa County
No.  JD510684
The Honorable Brian K. Ishikawa, Retired Judge

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant Mother*

The Stavris Law Firm, PLLC, Scottsdale
By Christopher Stavris
*Counsel for Appellant Father*

Arizona Attorney General's Office, Mesa
By Amanda L. Adams
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Lawrence F. Winthrop joined.

---

H O W E, Judge:

¶1        Samantha M. ("Mother") and Nykkolas S. ("Father") appeal the trial court's order terminating their parental rights to K.S., born March 2011, on grounds of substance abuse for Father and time in out-of-home placement for nine and fifteen months pursuant to court order for both parents. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

### 1. The Report to the Department

¶2        Father was addicted to methamphetamine; after one month of not using, he relapsed. That December day, he and Mother fought in one-year-old K.S.'s presence. Both parents were physically violent towards each other. Mother ran into a room with K.S. and slammed the door on Father's arm. She locked the door, but Father tried to get in. He punched a hole in the door; she kneed the door on the other side, attempting to kick Father. Mother called her sister, who called the Department's[1] hotline and reported the incident.

¶3        When a case manager spoke to Mother and Father the next day, they confirmed the report and admitted that they fought frequently. Mother admitted that K.S. was present during those incidents and was once hit by an object Father threw. Both parents admitted that Father used methamphetamine the day before, and Father admitted that he was addicted. They also reported that they struggled with depression and used marijuana in front of K.S.

¶4        The Department took temporary custody of K.S. and placed her with her maternal grandfather and his wife. The Department also

---

[1]        The Department of Child Safety was substituted for the Arizona Department of Economic Security in this matter. *See* Ariz. R. Civ. App. P. 27; S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted). For convenience, we refer to both as "the Department."

petitioned for dependency, alleging that K.S. was dependent as to both parents. It contended that Mother and Father were unable to parent due to substance abuse, domestic violence, mental health issues, and neglect. Mother and Father denied the allegations, but the juvenile court adjudicated K.S. dependent and approved the Department's family reunification plan.

¶5        The Department offered services to Mother and Father, and they agreed to participate in substance abuse assessment and treatment, demonstrate continued sobriety through random drug testing, participate in psychological evaluations and follow any recommendations, and participate in family and individual counseling. They also agreed to participate in supervised visits, enroll in parenting classes, and maintain stable housing and employment.

## 2. The Mental Health Evaluations

¶6        Mother was psychologically evaluated and reported a history of substance abuse with marijuana, spice, methamphetamine, powder cocaine, ecstasy, alcohol, and pain pills. The psychologist diagnosed her with anxiety disorder with panic attacks, major depressive episodes, amphetamine abuse, poly-substance abuse, severe relationship problems, and borderline personality characteristics. The psychologist concluded that Mother displayed "evidence of mental illness suggesting a serious affective disorder that include[d] an anxiety disorder with panic attacks [and] a possible bipolar disorder." He opined that Mother's "major affective disorders" and substance abuse could impair her judgment and put K.S. at serious risk. He recommended that before family reunification occurred, Mother should have psychiatric intervention, substance abuse intervention, and relationship therapy, if she stayed with Father. He noted that Mother would need 6 to 12 months to resolve her issues with Father, maintain patterns of sobriety, and stabilize her health.

¶7        The psychologist evaluated Father the same day. Father admitted that he had used marijuana, spice, crystal methamphetamine, powder cocaine, painkillers, ecstasy, and alcohol. Father reported that he had a methamphetamine problem and that he had recently used marijuana. The psychologist diagnosed Father with bipolar disorder, severe relationship discord, amphetamine dependence, and poly-substance abuse. He concluded that Father's substance abuse and bipolar disorder "affected his parenting because of the dynamics of his interpersonal relationships, the impact of his judgment, [and] the distortion in his mood management." The psychologist recommended that Father receive substance abuse treatment;

3

psychiatric stabilization; relationship therapy, if he stayed with Mother; and a drug relapse prevention program because he was a high risk for relapse. The psychologist concluded: "[I]f [Father did] not embrace treatment and follow through with treatment and maintain sobriety, the conditions and significant risk factors and poor prognosis [would] continue for a prolonged and indeterminate period of time."

¶8            Mother and Father also participated in psychiatric evaluations. Mother reported that Father was physically and emotionally abusive and that K.S. was often "scared" when she witnessed the abuse. But Mother reported that she would repeatedly reconcile with Father and that they lived together on and off. The psychiatrist diagnosed Mother with cannabis dependence in early remission, mood disorder, anxiety disorder, and history of poly-substance abuse.

¶9            The psychiatrist opined that Mother's substance abuse and untreated mood and anxiety disorder would impact her ability to parent and would place K.S. at risk of neglect and abuse. The psychiatrist recommended that Mother have monitored urinalyses for one year of proven sobriety. He also recommended individual therapy to address her substance abuse, mood and anxiety disorders, domestic violence, anger management, co-dependency, and need for attention and self-harm behavior to get attention. The psychiatrist further recommended anger management and domestic violence trainings, substance abuse programs, parent aide services, parenting classes, relationship counseling with Father, and a psychiatric follow-up. He concluded that reunification should not occur until Mother's treatment providers indicated that she was substance free, psychiatrically stable, and able to independently care for K.S.

¶10            Father reported to the psychiatrist a history of domestic violence and admitted that he had thrown items at Mother, Mother had struck him, and Mother had swung at him with K.S. in her arms. The psychiatrist diagnosed Father with mood disorder and histories of poly-substance abuse, amphetamine dependence in early full remission, and cannabis dependence in early full remission.

¶11            The psychiatrist opined that Father's substance abuse would impact his ability to parent because he was likely to spend a significant amount of time obtaining, using, and recovering from the effects of drugs, placing the child at risk of abuse and neglect. The psychiatrist recommended that Father have monitored urinalyses for one year of proven sobriety. He also recommended that Father complete a substance abuse treatment program and an outpatient substance abuse program, one

year of individual counseling, anger management and domestic violence training, parent aide supervision, parenting classes, and relationship counseling with Mother. If Father followed the recommendations, remained sober, and maintained a healthy relationship with Mother without resorting to domestic violence, then the Department could consider reunification.

### 3. The Services Offered to Mother and Father

¶12        Mother and Father completed the substance abuse assessment and began participating in intensive outpatient ("IOP") treatment programs. But Mother attended inconsistently and had to be put on an "attendance contract." If she breached the contract, her treatment would immediately stop. Six month later, she completed the treatment program and entered a mandatory six-month aftercare program. Although Mother was initially resistant to the aftercare treatment, she eventually completed the program eight months later. During her substance abuse treatment, however, Mother tested positive for marijuana for the first couple of months and was not taking random drug testing throughout.

¶13        Father continued testing positive for methamphetamine and marijuana and did not comply with his substance abuse treatment. Father was put on an attendance contract for his IOP treatment, but he broke the contract and his treatment ended. The Department issued Father another referral and recommended that he participate in outpatient services twice per week. Father started another treatment—testing positive for methamphetamine during intake and admitting that he had relapsed—but that treatment also ended because he did not engage in the service. Father only participated in one group session and failed to engage in further treatment services.

¶14        Mother received two referrals for individual counseling, but the first terminated because she did not attend and the second because she did "not feel comfortable with her therapist." Another therapist offered to do individual sessions with Mother, but she did not accept the offer. Father hired his own therapist, and although Father's treatment closed successfully, he relapsed the same month his treatment ended.

¶15        The Department referred Mother and Father to couples counseling, but they stopped attending after two sessions because they had ended their relationship. The Department also set Mother and Father up with domestic violence and anger management groups, and although they

completed their intakes, they reported that they were unable to attend due to scheduling conflicts.

¶16        Meanwhile, Father and Mother participated in parent aide services. But Father's terminated unsuccessfully. Father had relapsed, and the parent aide decided that Father was a threat to K.S. because he attended several visits under the influence of drugs. The parent aide reported that during the last few visits, Father appeared irritable and did not interact with the child.

¶17        Mother's also terminated unsuccessfully. The parent aide reported that since Father's lapse, Mother only attended four of the twelve supervised visits and none of the one-on-one parenting skills training sessions. The parent aide also reported that Mother said "she just wanted to log a couple of hours with [K.S.] so it didn't look like she wasn't participating because she had been advised . . . that she was being noncompliant." The parent aide reported that many visits ended early because K.S. was hungry and neither parent provided food.

¶18        After Father and Mother broke up, Mother told their parent aide that she would not give up on her relationship with Father. She also gave conflicting information about their relationship status; sometimes saying they were together, other times they had separated. Because of Mother's inconsistent statements, the parent aide noted in several monthly reports that Mother was still involved with Father, but was "hiding it and lying about it to [the parent aide] and her family as well as [the Department]."

¶19        The Department moved to terminate Mother and Father's parental rights to K.S. It alleged that Father was unable to discharge his parental responsibilities due to chronic substance abuse and that Mother and Father had substantially neglected or willfully refused to remedy the circumstances that caused K.S. to remain in an out-of-home placement for nine months and were unable to remedy the circumstances that caused K.S. to remain in an out-of-home placement for fifteen months, both pursuant to court order. The Department also alleged that termination was in K.S.'s best interests.

¶20        After the Department filed its termination petition, Mother and Father reconciled and began living together again. Over the next nine months, the Department continued to offer Mother and Father services, including random drug testing, individual and couples counseling, parent aide services, and supervised visits and substance abuse services for Father.

But Mother and Father failed or refused to participate in many of the services provided, including domestic violence and anger management classes.

¶21 The Department issued Father a third referral for substance abuse treatment. Although Father completed the treatment program, he was once again put on an attendance contract. Father's treatment closed unsuccessfully because he did not complete the aftercare treatment program. Further, Father continued testing positive for marijuana and admitted to his case manager that he and Mother interacted with individuals who smoked marijuana. The Department learned that between April and August of that year, Father had obtained no less than thirteen prescriptions for oxycodone and hydro-condone from eight different providers and that he had filled them at various pharmacies. One month before the severance hearing, Father and Mother once again ended their relationship.

### 4. Termination of Parental Rights

¶22 At the severance hearing, the case manager testified that for the last two years, Mother and Father had made little progress. She explained that Father had not completed his drug treatment, Mother and Father had not completed individual or couples counseling, they had not followed the mental health recommendations, and the Department continued to be concern about domestic violence. The case manager also testified that K.S. had been in an out-of-home placement for over twenty-five months, that she was adoptable, and that she was placed with her maternal grandfather and his wife, who were meeting all her needs and were willing to adopt her.

¶23 The trial court terminated Mother and Father's parental rights to K.S. on grounds of chronic substance abuse for Father and nine and fifteen months in out-of-home placement pursuant to court order for both parents. It also found that termination was in K.S.'s best interests. Mother and Father timely appealed.

### DISCUSSION

¶24 Mother and Father argue that insufficient evidence support the juvenile court's order terminating their parental rights to K.S. and its finding that termination was in the child's best interests. We review a juvenile court's termination order for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9, 344 P.3d 842, 844 (App. 2015). We accept the court's factual findings unless no reasonable evidence supports those

findings, and we will affirm a severance order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1, 200 P.3d 1003, 1005 (App. 2008). Further, we will affirm the termination if any of the statutory grounds is proven and if termination is in the child's best interests. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 376 ¶ 14, 231 P.3d 377, 380 (App. 2010). The juvenile court did not abuse its discretion in terminating Mother and Father's parental rights on ground of fifteen months in out-of-home placement pursuant to court order and finding that termination was in the child's best interests.

## 1. Statutory Ground for Termination

**¶25**        As relevant to our disposition of this appeal, Mother and Father first argue that insufficient evidence supports the juvenile court's order terminating their parental rights on ground of fifteen months in out-of-home placement pursuant to court order. A parent's right to care, custody, and control his or her child has long been recognized as fundamental, but that right is not absolute. *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 78 ¶ 6, 117 P.3d 795, 797 (App. 2005). The State may terminate a parent's fundamental right to a child under statutorily enumerated conditions after following specified procedures. *Id.*

**¶26**        As pertinent here, to terminate parental rights for time in an out-of-home placement, the juvenile court must find by clear and convincing evidence that (1) the child had been in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to court order; (2) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement; and (3) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288 ¶ 41, 110 P.3d 1013, 1022 (2005). In its determination, the court must consider "the availability of reunification services to the parent and the participation of the parent in these services." A.R.S. § 8–533(D).

**¶27**        Here, reasonable evidence supports the juvenile court's termination on ground of fifteen months in out-of-home placement pursuant to court order. By the time of the severance hearing, K.S. had been in an out-of-home placement pursuant to court order for more than two years. The record shows that during that time, Father and Mother failed to address their domestic violence and mental health issues and Father his substance abuse issue and that substantial likelihood exists that Father and Mother would not be able to exercise proper and effective parental care and

control in the near future. Although both parents reported relationship problems—including physical altercations against each other—to their case manager and parent aide and during their mental health evaluations, Mother and Father continued to live together. They also refused to attend couples counseling and domestic violence and anger management trainings. In fact, the record shows that even though Mother and Father told their case manager and parent aide that they ended their relationship, both individuals suspected that Mother and Father were still together and was simply hiding it. Moreover, even though Mother and Father separated on the eve of the severance hearing, their case manager testified that she did not think they would remain apart long because of their history of reconciling.

¶28        Father and Mother also failed to address their mental health issues, even though doctors gave them specific recommendations. Mother was diagnosed with various mental health issues, including anxiety disorder with panic attacks, major depressive episodes, and severe relationship problems. A psychiatrist told Mother that her substance abuse and untreated mood and anxiety disorder would impact her ability to parent and would place K.S. at risk of neglect and abuse. He also told her that reunification should not occur until her treatment providers indicated that she was substance free, psychiatrically stable, and able to independently care for K.S.

¶29        Father was also diagnosed with various mental health issues, including bipolar disorder, severe relationship discord, amphetamine dependence, and poly-substance abuse. A psychologist told Father that he needed to embrace treatment and follow through with it and maintain sobriety, or else the significant risk factors would continue for a prolonged and indeterminate period of time. Similarly, a psychiatrist told Father that if he actively followed the recommendations, remained sober, and maintained a healthy relationship with Mother without resorting to domestic violence, only then would the Department consider reuniting him with K.S.

¶30        But the record shows that even with these diagnoses and the recommendation that Father and Mother actively engage in services before reunification occurs, both parents did not make serious efforts to comply with the services offered. This remained true even after the court changed the case plan to severance and adoption. In fact, Mother and Father failed to fully engage in domestic violence and anger management groups, completing only the intake process. They also failed to successfully

complete parent aide services; Mother because she did not engage in the services and Father because he attended sessions impaired.

¶31 Further, although Mother completed substance abuse treatment and recovery maintenance, she did not fully engage in individual counseling and was re-referred on separate occasions after being terminated for not engaging in treatment. During the entire proceeding, Mother failed to fully recognize the safety concerns presented by Father's substance abuse and domestic violence conflicts within their relationship—admitting to her parent aide that she would never give up on Father and repeatedly reconciling with Father.

¶32 Father has failed to address his substance abuse issues. Father admitted that he had an extensive history of substance abuse, including marijuana and methamphetamine. But despite warnings from the case manager and doctors, Father did not make serious efforts to comply with the substance abuse programs. Over the course of the dependency proceedings, Father submitted inconsistently to urinalysis testing and tested positive several times for marijuana and methamphetamine. Moreover, Father was referred to substance abuse assessment and treatment on three separate occasions and terminated for the third time unsuccessfully for lack of participation in the aftercare treatment program.

¶33 Moreover, the record shows that the Department has made a diligent effort to provide the appropriate reunification services to Mother and Father, including urinalysis testing, substance abuse assessments and treatment, psychological and psychiatric evaluations, individual and couples counseling, domestic violence and anger management trainings, parent aide services, parenting classes, and transportation. The record also shows that even though Mother and Father terminated unsuccessfully for certain services, the Department offered additional referrals to support Mother and Father. Consequently, the record supports the juvenile court's order terminating Mother and Father's parental rights on ground of fifteen months in out-of-home placement pursuant to court order. We need not address the other grounds. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251 ¶ 27, 995 P.2d 682, 687 (2000) (providing that if sufficient evidence supports any one of the statutory grounds upon which the juvenile court ordered severance, the appellate court need not address the claims pertaining to the other grounds).

### 2. The Child's Best Interests

**¶34**        Mother and Father next argue that the evidence does not support the juvenile court's finding that termination was in the child's best interests. A finding of one of the statutory grounds for severance under A.R.S. § 8–533, standing alone, does not permit termination of parental rights; severance must also be in the child's best interests. A.R.S. § 8–533 (B). Severance of a parent's parental rights is in the child's best interests if the Department proves that the child would either benefit from the termination or be harmed by the continuation of the parent-child relationship. *Id.* In determining whether the child would benefit, relevant factors to consider include whether the current placement is meeting the child's needs, whether there is an adoption plan is in place, and whether the child is adoptable. *See Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 300 ¶ 19, 339 P.3d 1040, 1045 (App. 2014); *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 288 ¶ 26, 257 P.3d 1162, 1168 (App. 2011). The juvenile court need only find by a preponderance of the evidence that termination is in the child's best interests. *Kent K.*, 210 Ariz. at 288 ¶ 41, 110 P.3d at 1022.

**¶35**        Here, reasonable evidence supports the juvenile court's finding that termination was in K.S.'s best interests. When the Department took custody of K.S., it placed her with her maternal grandfather and his wife—where she remained for the entire course of the proceedings. The case manager testified that K.S. would benefit from severance. She explained that K.S. was adoptable and that her maternal grandfather and his wife were meeting all the child's needs and that if given the opportunity, they would adopt her. Consequently, the juvenile court did not abuse its discretion in terminating Mother and Father's parental rights to K.S. and finding that termination was in the child's best interests.

### CONCLUSION

**¶36**        For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama