IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO E.M. and D.M.,
JR.

No. 1 CA-JV 24-0153

FILED 04-16-2026

Appeal from the Superior Court in Maricopa County
No. JD534278
The Honorable Joshua D. Rogers, Judge

**AFFIRMED**

COUNSEL

Maricopa County Office of the Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant Donald P.*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

Maricopa County Office of the Legal Advocate, Phoenix
By Amanda Adams
*Counsel for Appellees E.M. and D.M., Jr.*

**OPINION**

Presiding Judge Kent E. Cattani delivered the opinion of the Court, in
which Judge Samuel A. Thumma and Judge Angela K. Paton joined, and
Judge Samuel A. Thumma specially concurred.

**C A T T A N I**, Judge:

¶1        Donald P. ("Father") appeals an order terminating his parental rights as to two of his children, E.M. and D.M. (collectively, "Children"), on the length-of-felony-sentence statutory ground.[1] *See* A.R.S. § 8-533(B)(4). This opinion addresses how to assess "the degree to which the parent–child relationship can be continued and nurtured during the incarceration," the second of six non-exclusive factors relevant to whether a parent's imprisonment will deprive the child of a "normal home" as necessary to support termination on this statutory ground. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251–52, ¶ 29 (2000). To avoid rendering this second *Michael J.* factor "self-fulfilling," *see Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581, ¶ 17 (2021), as discussed below, the superior court must address something beyond the limitations inherent in imprisonment and instead render an individualized determination of whether and how the parental relationship can—or cannot—be maintained despite those limitations.

¶2        Consistent with a concession of error by the Arizona Department of Child Safety ("DCS"), we suspended this appeal and revested jurisdiction in the superior court for clarified findings regarding the degree to which Father's relationship with Children can be continued and nurtured while he remains incarcerated. Having considered the clarified findings, along with supplemental briefing, we now affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶3        E.M. and D.M. were born in 2016 and 2018, respectively. In 2019, Father was arrested on various felony charges. He pleaded guilty to three nonviolent felony offenses in 2021 and was sentenced to a total term of 11 years in prison. Father's anticipated release date is in 2028.

¶4        In September 2021, a few months after Father's sentencing, DCS removed Children and their siblings from Mother's home due to concerns of substance abuse and neglect. Father, who remained in prison, did not contest the allegations of DCS's resulting dependency petition, and the court found Children dependent as to him.

---

[1]        Cynthia M. ("Mother")'s parental rights as to Children have also been terminated, but she is not a party to this appeal. Father's older children were subject to the dependency but are not parties to this appeal.

**¶5**        DCS records reflect that Father actively engaged in the case and communicated with DCS throughout, and that he completed programs offered in prison to improve his parenting capabilities. Father likewise had positive, established relationships with Children, notwithstanding that they were quite young when he was taken into custody and he has been incarcerated ever since. Father consistently asked for visitation, and although DCS had some difficulty coordinating visits through the Department of Corrections, Father ultimately received—and consistently participated in—weekly virtual visits and monthly in-person visits.

**¶6**        After the dependency had been pending for two and a half years, DCS moved to terminate Father's parental rights on the length-of-felony-sentence statutory ground. *See* A.R.S. § 8-533(B)(4). Father waived his right to trial on termination and did not contest the allegations of DCS's motion. *See* Ariz. R.P. Juv. Ct. 353(e). The DCS case manager then testified that Father's 11-year felony prison sentence spanning the bulk of Children's minority created significant barriers to providing for their basic needs. Although Father had an established relationship with Children before his incarceration and continued to seek out and engage in visitation, Father's prison sentence left Children without a normal home life because Mother's parental rights were terminated at the same time and guardianship was not a practical alternative.

**¶7**        Finding that Father's felony prison sentence was of such length that Children would be deprived of a normal home for a period of years and that termination would be in Children's best interests, the superior court terminated Father's parental rights. Father timely appealed.

**¶8**        After considering Father's argument that the superior court misapplied the second *Michael J.* factor and DCS's concession of error on that point, we suspended the appeal and revested jurisdiction in the superior court to clarify its finding on "the degree to which the parent–child relationship can be continued and nurtured during the incarceration" and enter an amended ruling on termination. *See* 196 Ariz. at 251–52, ¶ 29; *see also* Ariz. R.P. Juv. Ct. 608(b)(4). The superior court reassessed the second *Michael J.* factor and found that Father's established relationship with Children could, in fact, be maintained and nurtured through visitation despite the limitations occasioned by his incarceration. The court nevertheless found termination to be appropriate, reasoning that the other *Michael J.* factors underscored how Father's incarceration would leave Children without a normal home for an extended period. The court specifically found that no other parent or potential permanent guardian was available to give Children a normal home life.

**¶9** We reinstated the appeal and received supplemental briefing addressing the superior court's amended ruling. We have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

**¶10** The superior court may terminate a parent–child relationship if clear and convincing evidence establishes at least one statutory ground for termination and a preponderance of the evidence shows termination to be in the child's best interests. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005). On review, we accept the superior court's factual findings if supported by reasonable evidence, giving due regard to that court's unique ability to weigh the evidence and assess witness credibility. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023). We uphold the court's legal conclusions unless they are clearly erroneous. *Id.* at 478–79, ¶ 31.

**¶11** When a parent knowingly, intelligently, and voluntarily waives the right to trial on termination and does not contest the allegations of the termination motion, however, our review is limited to the issues contemplated by the waiver procedure itself. *See Tina T. v. Dep't of Child Safety*, 236 Ariz. 295, 298, ¶ 14 (App. 2014); *see also* Ariz. R.P. Juv. Ct. 353(e). These considerations include the existence of a factual basis for termination and adequacy of the required factual findings supporting termination. *See Tina T.*, 236 Ariz. at 298, ¶ 14; *see also* Ariz. R.P. Juv. Ct. 353(e)(3)–(4), (h)(2)(A) (requiring "specific findings of fact in support of the termination of parental rights"); A.R.S. § 8-538(A) (requiring a termination order to "be in writing" and to "recite the findings on which the order is based").

## I. Length-of-Felony-Sentence Termination Ground.

**¶12** The statutory ground at issue here—length of felony sentence—authorizes termination of parental rights if an incarcerated parent's felony sentence "is of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4). A "normal home" in this context means "a stable and long-term family environment outside a foster care placement, where another parent or a permanent guardian resides and parents the child, and where the incarcerated parent affirmatively acts to maintain a relationship with the child that contributes to rather than detracts from the child's stable, family environment." *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 477, ¶ 27 (2022).

¶13        In assessing deprivation of a normal home, the court should consider all relevant factors, including:

> (1) the length and strength of any parent–child relationship existing when incarceration begins, (2) the degree to which the parent–child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251–52, ¶ 29 (2000).

¶14        In substance, Father challenges the superior court's findings and application of the second and fifth *Michael J.* factors.[2]

>    **A.    The Second *Michael J.* Factor: Degree to Which the Parent–Child Relationship Can Be Continued and Nurtured During the Incarceration.**

¶15        Father asserts that, in the original termination ruling, the court misapplied the second *Michael J.* factor by focusing solely on the limitations of prison visitation and lack of traditional types of parent–child contact, rather than considering the degree to which Father's relationship with Children could nevertheless be nurtured. DCS concedes error in this regard, and we agree. Although the superior court has since corrected this error, we address it here to provide guidance in future cases.

¶16        As our supreme court has explained, the second *Michael J.* factor cannot be applied in a way that "renders it self-fulfilling" by "impl[ying] that incarcerated parents could never adequately maintain a parent–child relationship with their young children." *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581, ¶ 17 (2021). That is, the second factor must address something beyond the limitations common to all incarcerated individuals, limitations like the fact that an incarcerated parent would necessarily be "unable to interact with the children in more traditional settings (i.e., home, school, and recreational)." *Id.* at ¶ 16. Instead, the pertinent inquiry considers the parent's specific circumstances to assess

---

[2]    Apart from contesting the superior court's consideration of the possibility of guardianship, an argument that fails, *see infra* ¶¶ 26–28, Father does not challenge the court's best-interests findings.

"'how and whether' a parental relationship can be maintained" and the parent–child bond nurtured "in other ways, such as through visits, phone calls, letters, pictures, and gifts." *Id.* at ¶¶ 16–17 (citation omitted).

**¶17**　　　　The superior court's original findings (which adopted language submitted by DCS) fell short of this mark in two ways.

**¶18**　　　　First, the court focused on "the visitation restrictions of [the Department of Corrections]," which it found "only permitted short visitations and phone calls" and thus provided "minimal" opportunity to maintain the parent–child relationship.　But the limitations imposed by Department of Corrections policies cannot, alone, answer the second *Michael J.* factor.　If they did (as DCS concedes), no parent incarcerated in Arizona (and thus subject to these limitations) could ever adequately maintain a parent–child relationship, which would render this factor impermissibly self-fulfilling. *See id.* at ¶ 17.

**¶19**　　　　Such restrictions are not irrelevant—they have an obvious and direct bearing on parent–child contact and thus on the feasibility of maintaining the parent–child relationship.　But they must be considered as part of an individualized determination that takes into account the incarcerated parent's specific circumstances, not in isolation. *See id.* at ¶ 17; *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451, ¶ 17 (App. 2007) (considering, *inter alia*, lack of individuals who could facilitate visitation within Department of Corrections strictures).

**¶20**　　　　Second, in the original ruling, the superior court found that "Father is unable to perform normal parental duties such as providing food, shelter, clothing, supervision, education, and medical care for the children." This finding focused squarely on Father's inability "to parent in the conventional manner" or "interact with the children in more traditional settings"—precisely the self-fulfilling and thus insufficient considerations described in *Jessie D.*, 251 Ariz. at 581, ¶¶ 16–17.　Instead of focusing exclusively on those parental roles that are denied to an incarcerated parent, the court must instead assess whether or how the relationship could be maintained through other means. *See id.*

**¶21**　　　　Father did not contest the termination motion, but the court was nevertheless obligated to "make specific findings of fact in support of the termination."　Ariz. R.P. Juv. Ct. 353(e)(4), (h)(2)(A).　And the findings in the original termination ruling reflected a misapplication of the second *Michael J.* factor as described above. *See supra* ¶¶ 16–19.

¶22　　　　After this court suspended the appeal, the superior court reassessed the second *Michael J.* factor, considered Father's specific circumstances, and found that his established parental relationship could be maintained and nurtured through visitation despite the prison's visitation restrictions. This individual-focused determination, which considered but did not rest solely on the limitations occasioned by incarceration, correctly applied the second *Michael J.* factor in a manner that did not convert the fact of incarceration itself into a self-fulfilling basis for termination. *See Jessie D.*, 251 Ariz. at 581, ¶ 17. Although the superior court nevertheless found termination to be warranted, Father does not now challenge the amended termination ruling on this basis, and we discern no further error in this regard.

¶23　　　　Next, Father argues that the superior court erred by failing to make express factual findings or state legal conclusions regarding the adequacy of DCS's reunification efforts. Although § 8-833(B)(4) does not mention reunification services, the Arizona Supreme Court has recognized that DCS remains obligated to make reasonable efforts to provide reunification services, such as visitation, if requested by the incarcerated parent and if providing the services will not endanger the child. *Jessie D.*, 251 Ariz. at 581–82, ¶¶ 18, 21. The second *Michael J.* factor necessarily includes consideration of such reunification services to the extent they bear on the parent's ability to maintain a parent–child relationship while incarcerated. *See id.* at 582, ¶ 21.

¶24　　　　Here, although the superior court did not expressly mention reunification services, this is one of several considerations relevant to the second *Michael J.* factor. *See id.* at 581–82, ¶¶ 16–17, 21. And although the superior court must make "at least one sufficiently specific finding to support each . . . conclusion[] of law," it need not recite all relevant facts underlying its analysis in order to resolve disputed issues. *Logan B. v. Dep't of Child Safety*, 244 Ariz. 532, 537, ¶ 15 (App. 2018) (citation omitted). Father did not contest the termination motion, leaving no "disputed" issues in a meaningful sense. Moreover, visitation (which the court expressly addressed) was the core service at issue, and the record is replete with evidence of DCS's efforts to facilitate visitation. *Cf. Tina T.*, 236 Ariz. at 299, ¶ 16 (reciting standard for factual basis). Accordingly, Father has not shown error.

**B.      The Fifth *Michael J.* Factor: Availability of Another Parent to Provide a Normal Home Life.**

**¶25**      Finally, Father challenges the superior court's assessment of the fifth *Michael J.* factor, asserting that the court failed to meaningfully consider the possibility of a guardianship rather than termination. He argues that even the amended termination ruling focused too narrowly on unavailability of placement with a *relative* without addressing the possibility that Children's foster placements might pursue a permanent guardianship.

**¶26**      The fifth *Michael J.* factor, which addresses "availability of another parent to provide a normal home life," also includes consideration of the availability of a permanent guardian to provide a normal home life in the absence of another parent. *Timothy B.*, 252 Ariz. at 477, ¶ 27. The court thus should consider "whether another person is willing to be the child's permanent guardian," and if so, whether grounds for a permanent guardianship exist. *Id.*

**¶27**      Here, the court found that no potential permanent guardian was available, expressly considering relatives as well as Children's foster placements. Although Father disputes the reasons that guardianship was not a viable alternative, the only evidence was that no guardian was available; there was no evidence to the contrary. Given the existence of this factual basis, *see Tina T.*, 236 Ariz. at 299, ¶ 16, Father has not shown error.

**¶28**      Accordingly, given an adequate factual basis for termination and adequate factual findings based on the appropriate legal framework, we affirm the superior court's amended termination ruling.

### CONCLUSION

**¶29**      We affirm.


**T H U M M A**, Judge, Specially Concurring:

**¶30**      I join the opinion fully, and without reservation. I write separately to question the continuing wisdom of Arizona law allowing a parent, who has knowingly, voluntarily and intelligently waived his or her right to contest a motion or petition to terminate parental rights, to then appeal from the resulting termination order.

**¶31**        There was a time when children languished in foster care for years and years. Thirty years ago, in some states, on *average* a "child removed from the home because of family problems spen[t] almost three years in foster care." H.R. Rep. No. 105-77, at 8 (1997). In an attempt to significantly shorten that time, Congress enacted the Adoption and Safe Families Act of 1997 (ASFA). *See* Pub. L. No. 105-89, 111 Stat. 2115. "ASFA mandates that states implement procedures designed to expedite permanent placement for children in foster care." *Rita J. v. Ariz. Dept. of Econ. Sec.*, 196 Ariz. 512, 514 ¶ 5 (App. 2000) (citation omitted). The Arizona Legislature then passed legislation to comply with ASFA's directive to "secur[e] permanent placement of children in foster care within twelve months of their temporary placement." *Id.* (citations omitted).

**¶32**        As a result, a juvenile court must "hold a permanency hearing to determine the future permanent legal status of" a child in care within: (1) six months after removal for a child under three years of age or (2) twelve months after removal otherwise. A.R.S. § 8-862(A); *accord* Ariz. R. Juv. Ct. P. 343(a) & (b).[3] These and other ASFA-driven requirements of Arizona law are designed to further "the primary purpose of ASFA [and Arizona law]: expediting the process of finding permanent placement for children." *Rita J.*, 196 Ariz. at 515 ¶ 10 (citations omitted).

**¶33**        When facing a motion or petition to terminate parental rights, a parent has a right to contest the allegations and demand an evidentiary adjudication, or the parent may admit or elect to not contest the allegations. *See* Ariz. R.P. Juv. Ct. 353(e). Here, at the termination adjudication hearing, Father waived his right to trial by deciding not to contest the allegations in the motion to terminate. *See* Ariz. R.P. Juv. Ct. 353(e); *see also* Ariz. R.P. Juv. Ct. 352(c)(6) (applicable to initial termination hearings).[4] When a parent admits or does not contest termination, the court asks the parent various questions to ensure that the decision is made knowingly, intelligently and voluntarily. *See* Ariz. R.P. Juv. Ct. 353(e). If so, the court makes appropriate findings and, if the party seeking termination meets its burden of proof, the court can enter an order terminating parental rights. Ariz. R.P. Juv. Ct. 353(e) & (h). However, notwithstanding the parent's waiver, and the ASFA and Arizona law directives to avoid delay, the parent who waived can still

---

[3] A third option, which applies infrequently, requires the permanency hearing to be held "[w]ithin thirty days after the disposition hearing if the court does not order reunification services." A.R.S. § 8-862(A)(1).

[4] Similar procedures apply when a "permanent guardianship" is sought. *See* Ariz. R.P. Juv. Ct. 345(c)(7); 346(d).

appeal from the resulting order terminating that parent's rights. That is precisely what happened here.

¶34        In this case, E.M. and D.M. (about 10 and eight years old respectively) have been in care for nearly four and a half years, about half their lives. In June 2024, after a lengthy exchange with the court, Father made the difficult decision to not contest the termination allegations. In doing so, he stated "[t]he most important thing to me is my kids," adding he did not "want to prolong this anymore than it has to." The court found Father "knowingly, voluntarily, and intelligently waived his right to contest the allegations in the termination motion" and, after receiving evidence, terminated Father's parental rights. Father then appealed that termination order, as is his right under current Arizona law. Given that appeal, which prevents final placement for the children, this opinion affirming the termination will issue about 21 months after the June 2024 termination order. That 21-month delay, I submit, runs counter to the expedited permanent placement directive in ASFA and Arizona law. *See Rita J.*, 196 Ariz. at 515 ¶ 10.

¶35        Contrast this with a guilty plea in a criminal case. When a criminal defendant wants to plead guilty to an offense, the court asks the defendant various questions to ensure that the guilty plea is made knowingly, intelligently and voluntarily. *See* Ariz. R. Crim. P. 17.1(b), 17.2, 17.3, 17.4. If so, and if facts are presented supporting the guilty plea, the court may accept it. *See* Ariz. R. Crim. P. 17.3(b). If the guilty plea is accepted, the criminal defendant who pled guilty waives any right to appeal. Ariz. R. Crim. P. 17.1(e).

¶36        It seems strange that a parent's waiver in a termination proceeding does not include waiving an appeal from the resulting termination order, thereby delaying permanency directed by ASFA and Arizona law by months or years, while a criminal defendant pleading guilty waives any right to appeal. This is particularly true given that a defendant pleading guilty in a criminal matter waives a constitutional "right to appeal in all cases," Ariz. Const. art. 2, § 24, while a parent's waiver in a termination proceeding leaves intact a statutory appeal, A.R.S. § 8-235(A).

¶37        It may be that the ability of a waiving parent to appeal from a resulting termination order is a relic from pre-ASFA days, when children were allowed to languish in foster care. Given the ASFA-driven requirements of Arizona law today, it would seem that those days are gone. If a criminal defendant waives a constitutional right to appeal by pleading guilty, it would seem proper for a parent waiving a right to contest

termination of parental rights to waive a statutory right to appeal in an effort to "expedit[e] the process of finding permanent placement for children." *Rita J.*, 196 Ariz. at 515 ¶ 10 (citation omitted).

**¶38**　　　I join the opinion fully, and without reservation. For these reasons, I separately concur to question the wisdom of Arizona law continuing to allow a parent, who has knowingly, voluntarily and intelligently waived his or her right to contest a motion or petition to terminate parental rights, to then appeal from the resulting termination order.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:　　　JR